UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

02 JAN -9 PH 2: 07

N.D. OF ALABAMA

| | |
|---|---|
| BARBARA S. JEFFCOAT and<br>SUSAN S. MORRIS,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF HUNTSVILLE, BONNIE<br>MACIORSKI, and TIMOTHY WILLIS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. CV-00-S-2245-NE

ENTERED

JAN 0 9 2002

## MEMORANDUM OPINION

Plaintiffs, Barbara S. Jeffcoat and Susan S. Morris, were arrested by defendants Bonnie

Maciorski and Timothy Willis, police officers for the City of Huntsville, Alabama, following a

traffic stop for which Jeffcoat was suspected of driving under the influence of alcohol.  Plaintiffs

sued defendants in the Circuit Court of Madison County, Alabama, for violations of Alabama tort

law, and, rights secured by under the Fourth and Fourteenth Amendments to the United States

Constitution.  Defendants properly invoked this court's removal jurisdiction pursuant to 28 U.S.C.

§§ 1331, 1441(b), and the court's supplemental jurisdiction over plaintiffs' state law tort claims

under 28 U.S.C. § 1367(a).  This action presently is before the court on defendants' motion for

summary judgment.  Upon consideration of the pleadings, evidentiary submissions, and briefs, this

court concludes that the motion is due to be granted in part.

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper,

but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P.

56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiffs.

## I. STATEMENT OF FACTS

Plaintiffs, Barbara Jeffcoat ("Jeffcoat") and her sister, Susan Morris ("Morris"), were traveling on Interstate 565 in Huntsville, Alabama, during the early morning hours of November 14, 1999.[1] Jeffcoat was driving Morris's 1999 Jeep Cherokee, and Morris was seated in the front passenger seat. They were proceeding in an easterly direction at approximately 60 miles per hour when they were stopped about 1:15 a.m. by defendant Bonnie Maciorski ("Maciorski"), a uniformed

---

[1] *See* Second Amended Complaint ¶ 1.

patrol officer for the City of Huntsville Police Department, and, a member of the department's DUI task force.[2] Maciorski and Officer Timothy Willis ("Willis") were traveling in separate patrol vehicles in the same direction as plaintiffs, with Willis in the right-hand lane next to plaintiffs, and Maciorski in the middle lane directly behind plaintiffs.[3] Although Jeffcoat was not exceeding the speed limit,[4] Maciorski testified in deposition that she pulled Jeffcoat over for a routine traffic stop because she was "weaving and almost hit[] an officer in his car."[5] Maciorski "noticed the vehicle weaving. At one time, the vehicle went out of its lane and almost hit Officer Willis's vehicle,"[6] requiring Willis to "make a defensive move" to avoid hitting plaintiffs' vehicle.[7] After Maciorski observed plaintiffs' car "leav[e] its lane several times," she activated her patrol lights, signaling for plaintiffs to pull over to the side of the road.[8] Maciorski parked her vehicle directly behind plaintiffs' automobile, while Willis pulled over just behind Maciorski's police cruiser.[9]

When Maciorski approached Jeffcoat, she allegedly "smelled the odor of alcohol ... coming from inside ... the vehicle ...."[10] Maciorski testified at plaintiffs' Huntsville Municipal Court trial on March 8, 2000 that she

> spoke to Ms. Jeffcoat and explained to her why I had stopped her. I asked her if she had anything to drink. She said no; she was sleepy. I could smell the odor of alcoholic beverages. I went back to my vehicle and got my Alco[sensor]. I asked Ms. Jeffcoat to take, to administer the Alco. She refused that. When ... she refused

---

[2] *See id.* ¶ 2; *see also* Plaintiffs' evidentiary submissions, Tab 1 (Price affidavit), at 1-2.

[3] Second Amended Complaint ¶ 2.

[4] Defendants' evidentiary submissions, Tab 1 (Maciorski deposition), at 37.

[5] *Id.* at 40.

[6] Plaintiffs' evidentiary submissions, Tab 1 (Price affidavit), at 2.

[7] Defendants' evidentiary submissions, Tab 1 (Maciorski deposition), at 32.

[8] *Id.* at 27, 28, 33.

[9] Plaintiffs' evidentiary submissions, Tab 1 (Price affidavit/trial transcript), at 2.

[10] *Id.* at 3; *see also* Defendants' evidentiary submissions, Tab 1 (Maciorski deposition), at 42.

that, I said okay, step out of your vehicle[;] we'll do field sobriety tests.  At that time, she refused to get out of her vehicle.[11]

According to Maciorski, Jeffcoat refused to take field sobriety tests, saying "I'm not getting out of the vehicle,"[12] and she "held onto the steering wheel."[13]  Maciorski claims that she did the

best I could to convince her to step out of the vehicle so we could do field sobriety tests.  At one time, I said to her that she needed to step out so we wanted to do that.  And Officer Willis came around to [the driver's] side of the vehicle and at that time we told her that she needed to step out of the vehicle or she was under arrest.[14]

Maciorski testified that it took "several minutes" to get Jeffcoat out of her car, which she and Willis accomplished by "grabb[ing] her arms" and "convinc[ing] her to come out of the vehicle."[15]

Once Jeffcoat got out of her car, Maciorski — who was "convinced that [Jeffcoat] was under the influence of alcohol"[16] — attempted to charge and arrest Jeffcoat for driving under the influence of alcohol, based on Maciorski's "observation of her driving, the odor of an alcoholic beverage and her demeanor."[17]  As Willis placed a handcuff on Jeffcoat's right arm, however, she "panicked."[18] Jeffcoat tried to explain that she was extremely claustrophobic, while "screaming" not to handcuff her.[19]  According to Jeffcoat:  "I was resisting them putting the handcuff on me, on my other wrist,"

---

[11] Plaintiffs' evidentiary submissions, Tab 1 (Price affidavit/trial transcript), at 3.  According to Maciorski, an Alcosensor "is a little hand-held instrument with a tube attached to the end of it that the individual blows into ... It will register a number on the screen if there is alcohol.  If there is not, it won't."  Defendants' evidentiary submissions, Tab 1 (Maciorski deposition), at 46.

[12] Defendants' evidentiary submissions, Tab 1 (Maciorski deposition), at 48.

[13] Plaintiffs' evidentiary submissions, Tab 1 (Price affidavit/trial transcript), at 3.

[14] Id.; see also Defendants' evidentiary submissions, Tab 1 (Maciorski deposition), at 51.

[15] Plaintiffs' evidentiary submissions, Tab 1 (Price affidavit/trial transcript), at 4.

[16] Id. at 5.

[17] Id. at 4.

[18] Defendants' evidentiary submissions, Tab 3 (Jeffcoat deposition), at 45.

[19] Id.

4

by "struggling not to put my hand behind me,"[20] "holding onto a belt loop ... to my jeans,"[21] and "turning [my] body, jerking around."

"[A]fter several minutes of struggling around the vehicle, around the side of the vehicle, and around the back of the vehicle and the other side of the vehicle, ... [Maciorski and Willis] were finally successful in placing the handcuffs on Ms. Jeffcoat."[22]  Once they did, defendants placed Jeffcoat in the back seat of Maciorski's police vehicle.[23]

While defendants were attempting to complete their arrest of Jeffcoat, Morris stepped out of her automobile and

> started trying to reason with the officer who was there with me.  And I can't remember if it was Officer Willis or [another male officer who had arrived at the scene].  But I was telling them, you know, "She's an incest survivor, she's highly claustrophobic, you will not be able to get both handcuffs on her, you know, without a fight, if there is another way to do this."  I was pleading with them, just pleading.[24]

Morris walked from the passenger side to the rear of her automobile to retrieve a cellular telephone from the trunk.[25]  Morris did so even though she had been instructed by Willis to stay inside her vehicle.  When defendants saw that Morris was attempting to open the boot of the Jeep Cherokee, one of the officers at the scene directed her "to get back in the car."[26]  Morris disobeyed this instruction, instead continuing to walk toward the rear of her automobile — where defendants and Jeffcoat were struggling.[27]  Morris saw that Jeffcoat was "twisting and turning," and "trying to keep

---

[20] *Id.* at 47.

[21] *Id.* at 48.

[22] Plaintiffs' evidentiary submissions, Tab 1 (Price affidavit/trial transcript), at 4.

[23] *See* Defendants' evidentiary submissions, Tab 3 (Jeffcoat deposition), at 54.

[24] *Id.*, Tab 4 (Morris deposition), at 34.

[25] *Id.* at 34-35.

[26] *Id.* at 36.

[27] *Id.* at 37.

[defendants] from putting the handcuffs on her left wrist," by "keeping her arm away from them and turning her body."[28]

Morris testified that she was three feet away from the police officers at this point and, although she could see that Jeffcoat was "struggling and twisting and turning and resisting the officers' attempts to handcuff her," Morris "didn't ask her or request [Jeffcoat] to just cooperate with the officers."[29]    Morris instead told defendants repeatedly that Jeffcoat was claustrophobic, instructing the officers that Jeffcoat would not resist the arrest if they handcuffed her in a fashion other than behind her back.[30]  Morris admits that she was told to "back away," and testified in deposition that she complied with this request, backing at least three feet away from defendants, although she continued to plead with them on Jeffcoat's behalf.[31]  In fact, however, the videotape of the arrest recorded by a television camera in Willis's police cruiser — while dark, unclear, and graced only with intermittent sound of the events at the scene — clearly shows Morris approaching the officers and Jeffcoat on at least *six* different occasions, despite at least two audible warnings by Willis to "stand back" and "get away."[32]

Once Jeffcoat was in handcuffs in the back seat of the police cruiser, Maciorski transported her to a "blood alcohol van" parked at another location.[33]  Jeffcoat was taken inside the van, where she sat and waited for Maciorski to complete paperwork.  At one point, Jeffcoat asked another police

---

[28] *Id.*

[29] *Id.* at 38.

[30] *Id.* at 39.

[31] *Id.* at 39-40, 42.

[32] *See* Plaintiffs' evidentiary submissions, Tab 7 (Videotape of arrest), at 1:30:22; 1:30:28; 1:30:32; 1:30:43; 1:30:49, and 1:30:52.  Willis can be heard saying "Ma'am, get away from me" with some urgency at 1:31:18.  Morris was arrested soon after for resisting arrest, at 1:312:15.

[33] *See* Defendants' evidentiary submissions, Tab 3 (Jeffcoat deposition), at 59.

officer to check her handcuffs. The officer did so, and was able to insert a finger between the cuffs and Jeffcoat's wrist.[34] Maciorski again asked Jeffcoat to take a breath analysis test to gauge the level of her alcohol consumption, but Jeffcoat once again refused.[35] Maciorski then placed Jeffcoat in the back seat of the police cruiser, and left her there for what Jeffcoat believed to be one-and-a-half hours.[36]

Meanwhile, once Maciorski had managed to handcuff Jeffcoat at the scene of the traffic stop, Willis arrested Morris for resisting arrest — specifically for resisting Jeffcoat's arrest. Morris testified in deposition that Willis was polite to her, and "did not cuff me very tightly, you know, I didn't have any marks left on me from the handcuffs."[37] Willis put Morris in the rear of his police cruiser, and transported her to a DUI checkpoint. Once they arrived at the checkpoint, Willis left Morris in the back of his vehicle.[38] When Willis returned to the car some undetermined time later, he took Morris to Maciorski's police cruiser, where Jeffcoat was sitting in the back seat, crying.[39] When Morris got into Maciorski's car, Morris saw that Jeffcoat "began to cry hysterically and tremble ... she became very short of breath and was just sobbing and asking me, 'Help me, help me, what are we going to do, I can't move.'"[40] Both Morris and Jeffcoat then were transported to jail.[41]

During the trip, Morris claims that Jeffcoat was complaining that her handcuffs were too

---

[34] See id. at 62, 66.

[35] See id. at 68.

[36] See id. at 72.

[37] Id. at 45.

[38] Id. at 47-48.

[39] Id. at 48.

[40] Id.

[41] Id.

tight, although Morris did not hear Jeffcoat ask Maciorski to loosen them.[42] Morris asked Maciorski to take them to a hospital, saying that Jeffcoat suffered from a "heart condition."[43] Maciorski "said she would be the judge of that," and continued driving to the jail.[44]

Plaintiffs were booked, given jail-issue clothing, and taken to separate holding facilities.[45] At some point, Morris was taken to Jeffcoat's cell, in an effort to calm her sister. When Morris was unable to do so, she was removed from Jeffcoat's cell and returned to her own.[46]

Morris was released on bond at about 6:00 a.m. that morning. Jeffcoat was not released until approximately 8:00 a.m.[47] Later that same day, Jeffcoat went to the emergency room at Crestwood Hospital, complaining that her right hand "was hurt," and that she was experiencing "numbness in my right hand by this time, and my neck and shoulders were in pain."[48] Morris accompanied her, although Morris did not "suffer any physical injuries as a result of this incident."[49] While Morris did complain of mental anguish, sleeplessness, and emotional distress, Morris did not seek medical care for her condition.[50]

X-rays taken of Jeffcoat's hand at the emergency room showed neither bone nor soft-tissue abnormalities, but Jeffcoat was prescribed an anti-inflammatory medication.[51] Jeffcoat did not take time off from work due to her condition, but consulted another physician approximately two weeks

---

[42] *Id.* at 50.

[43] *Id.* at 49.

[44] *Id.*

[45] *Id.* at 52.

[46] *Id.* at 56.

[47] *Id.* at 57.

[48] *Id.*, Tab 3 (Jeffcoat deposition), at 91.

[49] *Id.*, Tab 4 (Morris deposition), at 61.

[50] *Id.*

[51] *Id.* at 93-94.

later.[52]  On December 1, 1999, she saw Dr. William Shergy, a rheumatologist who had previously treated her for fibromyalgia,[53] although she was "in no acute distress on that occasion."[54]  There is no evidence of Shergy's findings.

Jeffcoat sought treatment from another physician, Dr. Ray Fambrough, on December 9, because she was "having so much soreness and pain in my neck and shoulders, my hand was still numb, and I still had a faint impression of the cuff marks to my right arm.  And I was concerned that I had something wrong that needed to be taken care of."[55]  Jeffcoat testified in deposition that her wrists were still discolored when she was examined by Dr. Fambrough, and that the discoloration persisted for approximately one month after the November 14, 1999 arrest.[56]  Fambrough did not attribute any of Jeffcoat's complaints to her arrest, but instead opined that her neck and shoulder soreness or pain was due to a degenerative disc disease for which she had been treated in the past,[57]and that her wrist pain was due to a nerve problem that would resolve itself over time without medication.[58]

Jeffcoat admitted during her April 3, 2001 deposition that the nerve problem, in fact, had nearly resolved itself, although she continued to experience "a minimal amount of numbness."[59]  She has, however, continued to receive treatment for neck and shoulder pain, and on the date of

---

[52] *Id.* at 110.

[53] Fibromyalgia, according to Jeffcoat, is a "condition that is characterized by fatigue and aches and pains in the joint areas, really more muscle areas and joint areas of the body."  *Id.*, Tab 3 (Jeffcoat deposition), at 96.

[54] *Id.* at 97 (citing Dr. Shergy's records of Jeffcoat's office visit).

[55] *Id.* at 98.

[56] *Id.* at 97-98.

[57] *Id.* at 103.

[58] *Id.* at 101.

[59] *Id.* at 102.

deposition, was taking Vioxx, an anti-inflammatory medication[60] At some point, Jeffcoat also consulted a neurologist, Dr. Joel Pickett, regarding her neck pain.  Jeffcoat did not tell Pickett that the pain was the result of the November 14, 1999 arrest, however, because she "did not want to ...."[61]

Plaintiffs filed suit in the Circuit Court of Madison County, Alabama, on July 28, 2000, alleging in fourteen counts that defendants had violated Alabama tort law and plaintiffs' federal constitutional rights under the Fourth and Fourteenth Amendments.[62]  Defendants removed the action to this court on August 11, 2000, pursuant to 28 U.S.C. § 1441(b), invoking the court's federal question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

Defendants Maciorski and Willis subsequently moved the court to dismiss plaintiffs' complaint, or alternatively to require plaintiffs to file a more definite statement of their federal constitutional claims, and asserted a defense of qualified immunity to their § 1983 claims.[63]  In an order entered on September 13, 2000, this court dismissed plaintiffs' Fourteenth Amendment due process claims for plaintiffs' failure to adequately plead those claims.[64]  The court also dismissed plaintiffs' Fourteenth Amendment unreasonable search and excessive force claims, because those claims were more appropriately founded on the Fourth Amendment.  The court denied defendants' motion to dismiss as to plaintiffs' Fourth Amendment claims, however, because plaintiffs had pled adequately the elements of an unreasonable seizure and excessive force claim under that

---

[60] *See id.* at 105-06.

[61] *Id.* at 113.

[62] *See* Notice of Removal, Ex. (Complaint).

[63] Motion to Dismiss (doc. no. 2).

[64] Sept. 13, 2000 Memorandum Opinion (doc. no. 7), at 8.

constitutional provision.[65]   Finally, the court ordered plaintiffs to more definitely state their constitutional claims, in light of the fact that plaintiffs had not complied with the heightened pleading standard applicable to § 1983 claims (plaintiffs had made only conclusory allegations against the police officers, and had not factually substantiated why the police officers were not entitled to the defense of qualified immunity).[66]

The parties since have stipulated that all claims by plaintiffs against the City of Huntsville under 42 U.S.C. § 1983 are to be dismissed with prejudice.[67]   As such, this court proceeds with its analysis solely as to plaintiffs' remaining Fourth Amendment claims under § 1983 against defendants Maciorski and Willis in their individual capacities.

## II. DISCUSSION

Through 42 U.S.C. § 1983, Congress has created a private right of action for damages and injunctive relief against individuals and governmental entities whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes.[68]   *See, e.g., Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *partially overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *see also Burch v. Apalachee Community Mental Health Servs.,*

---

[65] *Id.* at 9.

[66] *Id.* at 11.

[67] Stipulation (doc. no. 34).

[68] 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

*Inc.*, 840 F.2d 797, 800 (11th Cir. 1988), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).  Plaintiffs here invoke § 1983 to claim that defendants, in their individual capacities as City of Huntsville police officers, violated right secured by the Fourth Amendment, first, by arresting them without probable cause and, second, by the use of excessive force in effectuating plaintiffs' arrest.[69]  Defendants assert that plaintiffs' claims to this effect are barred by the doctrine of qualified immunity.

Before this court can reach defendants' qualified immunity defense, however, it must first determine whether plaintiffs have alleged the deprivation of an actual constitutional right. *See Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (citing *Conn v. Gilbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999)).

> This order of procedure is designed to "spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).  Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public. *See County of Sacramento v. Lewis*, 523 U.S. 833, 840-42, n.5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

*Wilson*, 526 U.S. at 609, 119 S.Ct. at 1697.  As the Supreme Court recently wrote: "A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, ___, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5, 118 S.Ct. 1708, 1714 n.5, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense

---

[69] Plaintiffs' Brief in Opposition at 15-27.

of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.  Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question."); *Hartley v. Parnell*, 193 F.3d 1271, 1263 (11th Cir. 1999) ("Therefore, we must first determine whether the facts, read in the light most favorable to [plaintiff], establish that [defendant]'s actions deprived her of any statutory or constitutional rights. If the answer is 'yes,' we must then consider whether those rights were clearly established at the time of the events in this case.").

Accordingly, the court first determines whether plaintiffs have made out a proper claim for deprivation of Fourth Amendment rights — namely, whether defendants unreasonably seized them without probable cause.  If plaintiffs surmount this hurdle, the court next inquires whether the rights defendants violated were clearly established on the date of the arrest.  Applying that scheme to the facts here, "the court will first determine if Defendants had *actual* probable cause and if actual probable cause did not exist, then the court will address whether Defendants had *arguable* probable cause."  *Babers v. City of Tallassee, Alabama*, 152 F. Supp. 2d 1298, 1304 (M.D. Ala. 2001) (emphasis supplied).

## A.    Plaintiffs' First Fourth Amendment Claim: No Probable Cause to Arrest Jeffcoat for DUI

The Fourth Amendment permits a warrantless arrest if made with probable cause.  *See Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995); *see also Delaware v. Prouse*, 440 U.S. 648, 655-57, 99 S.Ct. 1391, 1397, 59 L.Ed.2d 660 (1979) ("[A]n arrest made *without* probable cause violates the Fourth Amendment." *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998) (emphasis supplied); *see also Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997).

13

Plaintiffs allege that Jeffcoat was arrested without probable cause because defendants "did not have an objective, good-faith belief that [Jeffcoat was] guilty of the offenses charged."[70]

Turning to the circumstances of Jeffcoat's DUI arrest, Jeffcoat and Morris were returning in Morris's car to Huntsville, Alabama in the early morning hours of November 14, 1999, following a football game and tailgate party in Tuscaloosa, Alabama the previous afternoon.[71] Jeffcoat testified in deposition that, as she was driving on Interstate 565, approximately thirty minutes from Huntsville, *Morris* "said to me that I was near a police officer and needed to watch out *because I almost drove into him* ."[72] Jeffcoat admitted that her car had partially left the lane in which she was driving, swerving into the lane to her right (where Willis was driving), and that Morris told her that Jeffcoat needed "to watch out," because she "'almost hit the police officer.'"[73]  At that moment, Jeffcoat looked over and saw Willis's police cruiser in the right-hand lane; she then noticed Maciorski's patrol car in her rear view mirror, signaling Jeffcoat to pull off the highway with its "blue lights."[74]

Once Maciorski's patrol car turned on its blue lights, Jeffcoat proceeded to exit the highway, activating her turn signal, and pulling onto the right shoulder of the road.[75]  Maciorski parked her police cruiser behind Jeffcoat, and Willis pulled in behind Maciorksi.  It is apparent from the video tape of the arrest that Maciorski approached Jeffcoat's side of the car, while Willis approached the passenger-side, where Morris was sitting.[76]

---

[70] Second Amended Complaint at ¶ 79.

[71] Defendants' evidentiary submissions, Tab 3 (Jeffcoat deposition), at 12, 15.

[72] *Id.* at 23 (emphasis supplied).

[73] *Id.* at 24.

[74] *Id.* at 25.

[75] *Id.*

[76] Plaintiffs' evidentiary submission, Tab 7 (Videotape of arrest), at 1:25:33.

14

It is important that the court determine first exactly who was responsible for Jeffcoat's DUI arrest, before it can assess whether the police officer had probable cause to make that arrest. Although plaintiffs acknowledge that "the officers testify uniformly that Officer Maciorski arrested Jeffcoat,"[77] plaintiffs nevertheless contend that it was Willis — rather than Maciorski — who told Jeffcoat that she was under arrest,[78] and who improperly "made the decision to place Jeffcoat under arrest, and ... did so without actual or even arguable probable cause."[79] Plaintiffs base this assertion on Willis's testimony that

> he did not form probable cause to believe Jeffcoat was under the influence of alcohol until she was getting out of the car and he allegedly smelled the odor of alcohol on her breath. This occurred only *after* she had already been placed under arrest, and does not support the arrest itself.[80]

Although plaintiffs contend that Willis was responsible for Jeffcoat's DUI arrest, Jeffcoat admits that it was Maciorski who took her driver's license, and commented that she had been "driving crazy."[81] Jeffcoat also admitted that it was: Maciorski who questioned her at the driver's side window as to whether she had been drinking;[82] Maciorski who commented during her questioning that Jeffcoat had been "swerving, which is a classic sign of driving drunk";[83] Maciorski who asked her to breathe into a "breath machine, a breathalyzer";[84] and Maciorski who asked her to perform field sobriety tests when Jeffcoat refused the breath test.[85] Indeed, Jeffcoat testified that she

---

[77] *Id.* at 16.

[78] Defendants' evidentiary submissions, Tab 3 (Jeffcoat deposition), at 40-41.

[79] Plaintiffs' Brief in Opposition at 15-16. Plaintiffs make this assertion without providing the court with supportive citation to the record.

[80] *Id.* at 16.

[81] Defendants' evidentiary submissions, Tab 3 (Jeffcoat deposition), at 25, 26, 27.

[82] *Id.* at 27.

[83] *Id.* at 28.

[84] *Id.* at 30.

[85] *Id.* at 32.

did not see Willis throughout her encounter with Maciorski, and "did not know at that time that he was out of his vehicle," because she "never saw him."[86] Further, once arrested, Jeffcoat was placed in the back of Maciorski's patrol car.[87] Finally, it was Maciorski who took Jeffcoat to a different location to have her alcohol consumption level tested,[88] and Maciorski who transported Jeffcoat and Morris to the municipal jail.[89] These uncontested facts lead inexorably to the conclusion that Maciorski made the decision to arrest Jeffcoat for DUI, although she was assisted in effecting the arrest by Willis.

Anticipating that conclusion, plaintiffs argue alternatively that, even if Maciorski — rather than Willis — was responsible for Jeffcoat's arrest, she did not have probable cause to arrest Jeffcoat for driving under the influence of alcohol. Maciorski testified that she arrested Jeffcoat because of "her driving, the smell of an alcoholic beverage, [and] her demeanor ...."[90] Plaintiffs dispute this, because they believe that the videotape of the arrest demonstrates that Jeffcoat was "coherent, articulate, and calm."[91] Plaintiffs further deny that Jeffcoat consumed alcoholic beverages during the tailgate party in Tuscaloosa, or during the drive from Tuscaloosa to Huntsville, and contend that the odor of alcohol emanating from the automobile was insufficient probable cause.[92] Plaintiffs also argue that Jeffcoat's passenger-side *tires* crossed into the lane next to her on just one occasion, but that her *vehicle* never left her lane.[93]

---

[86] *Id.* at 41.

[87] *Id.* at 57.

[88] *Id.* at 55.

[89] *Id.* at 75.

[90] *Id.*, Tab 1 (Maciorski deposition), at 55.

[91] Plaintiffs' Brief in Opposition at 17.

[92] *Id.* at 18..

[93] *Id.* at 18-19.

In evaluating defendants' motion for summary judgment, this court is obligated to draw all inferences from the evidence presented in the light most favorable to plaintiffs, and, to resolve all reasonable doubts in plaintiffs' favor. *See Spence*, 873 F.2d at 256. In doing so, it is not clear that Maciorski had actual probable cause to arrest Jeffcoat for driving under the influence of alcohol. For example, Jeffcoat explained her erratic driving to Maciorski when she stated that she had been driving from Tuscaloosa, Alabama since early that evening and was tired.[94] This explanation is plausible in light of the fact that she had been driving since approximately 8:30 p.m.,[95] and were pulled over by Maciorski at approximately 1:15 a.m. — about five hours later.[96] She was not speeding.[97] Further, while Maciorski and Willis both stated that they smelled alcohol coming from either the plaintiffs or their car, both plaintiffs dispute this, testifying instead that Jeffcoat had not been drinking that afternoon or during the drive to Huntsville.[98] Maciorski also did not recall whether Jeffcoat had blood-shot eyes or slurred speech, "important things to a DUI Task Force officer," which Maciorski had been for approximately four years.[99] In addition, Jeffcoat was able to stand up-right without assistance next to her vehicle.[100] Finally, the videotape of the arrest, which — while fraught with technical problems — does suggest that Jeffcoat was calm and articulate, at least at the beginning of the traffic stop.[101] The only fact not disputed by plaintiffs that suggests probable cause for Jeffcoat's DUI arrest is that Jeffcoat swerved into the lane to her right, nearly

---

[94] Defendants' evidentiary submission, Tab 3 (Jeffcoat deposition), at 27.

[95] The trip between Tuscaloosa and Huntsville took plaintiffs longer than the usual four hours because plaintiffs were delayed by foggy weather conditions, and stopped at a McDonald's restaurant for a beverage. *Id.* at 21.

[96] *See id.* at 20; plaintiffs' evidentiary submissions, Tab 7 (Videotape of arrest), at 1:24:59.

[97] Defendants' evidentiary submissions, Tab 1 (Maciorski deposition), at 27.

[98] *Id.*, Tab 3 (Jeffcoat deposition), at 19.

[99] *Id.*, Tab 1 (Maciorski deposition), at 7, 44.

[100] *Id.* at 43.

[101] *See* Plaintiffs' evidentiary submissions, Tab 7 (Videotape of arrest), at 1:28:14.

hitting Willis's police vehicle.[102]

"Probable cause exists if 'the facts and the circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *Madiwale*, 117 F.3d at 1324 (quoting *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986)). Although probable cause does not lend itself to easy definition, a survey of case law on the subject suggests that the probable cause sufficient for a DUI arrest in Alabama generally consists of a combination of factors, rather than just one factor (such as the sole, undisputed fact of Jeffcoat's lane swerve present in this case). *See, e.g., Griffin v. City of Clanton, Alabama,* 932 F. Supp. 1359, 1366 (M.D. Ala. 1996) (finding probable cause for Alabama police officer's DUI arrest where driver was stopped for traffic violation, police officer smelled alcohol on driver's breath, driver admitted to drinking, and failed field sobriety tests); *Ex parte City of Montgomery,* 758 So. 2d 565, 570 (Ala. 1999) (finding probable cause for DUI arrest where driver told police officer that she had been drinking, had mixed alcohol impermissibly with prescription drug, driver's eyes were bloodshot, driver was nervous and swaying, and driver failed field sobriety tests); *Hopper v. City of Prattville,* 781 So. 2d 346, 350-51 (Ala. Crim. App. 2000) (finding probable cause for DUI arrest where police officer smelled alcohol and marijuana, driver's speech was slurred, driver failed or refused to perform three field sobriety tests); *Smith v. State*, 606 So. 2d 174, 176-77 (Ala. Crim. App. 1992) (finding probable cause where driver was stopped for traffic violation and weaving, police officer smelled burning marijuana coming from car, and observed marijuana on seat of car), *Parks v. Director, State Department of Public Safety,* 592 So. 2d 1066, 1067 (Ala. Civ. App. 1992)

---

[102] *See supra* text accompanying notes 29-30.

(finding "more than probable cause" where driver was driving erratically, had strong odor of alcohol about him, was unstable, and failed to pass field sobriety tests); *Cains v. State,* 555 So. 2d 290, 291-92 (Ala. Crim. App. 1989) (finding probable cause to arrest where driver's eyes were bloodshot, he acted sluggish, was unsteady on his feet, spoke unclearly and with difficulty, smelled of alcohol, and failed a field a sobriety test); *Pittman v. State*, 541 So. 2d 583, 584 (Ala. Crim. App. 1989) (finding probable cause where police officer stopped driver for speeding, smelled burning marijuana on or about driver's person, and driver admitted to smoking marijuana). *But see Hurst v. Finley,* 857 F. Supp. 1517, 1521-22 (M.D. Ala. 1994) (finding no probable cause for Alabama police officer's DUI arrest of motorist who smelled of alcohol and admitted to having been drinking, because police officer arrested motorist without attempting to test his motor skills by administering field sobriety tests).

"The question of whether a law enforcement officer has probable cause to arrest a suspect is a matter of law for the court, not the trier of fact." *Hurst*, 857 F. Supp. at 1521 (citing *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). Evaluating the undisputed facts in the light most favorable to plaintiffs, this court finds that Maciorski did not have *actual* probable cause to arrest Jeffcoat for driving under the influence of alcohol on the basis of a single, partial swerve from the lane in which she was driving. As such, plaintiffs have established that Jeffcoat suffered a deprivation of her constitutional rights under the Fourth Amendment when Maciorski effected her arrest without actual probable cause to do so.

Having answered this threshold question, the court proceeds to defendants' qualified immunity defense.

When a state or local governmental official is sued personally, or in an "individual capacity,"

for money damages under § 1983, the official may invoke the doctrine of "qualified immunity" as a defense to the claim. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991). Essentially, the doctrine provides that "[g]overnment officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hartley v. Parnell*, 193 F.3d 1263, 1268 (11th Cir. 1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).[103] Stated somewhat differently, qualified immunity "protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter v. Alabama A & M University*, 28 F.3d 1146 (11th Cir. 1994) (en banc) (citations and internal quotation marks omitted).[104]

> The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." ... Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law.

*Anderson v. Creighton*, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting

---

[103] *See also, e.g., Jackson v. Sauls*, 206 F.3d 1156, 1164 (11th Cir. 2000) ("Qualified immunity shields a § 1983 defendant from liability for harms arising from discretionary acts, as long as the discretionary acts do not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.").

[104] The Eleventh Circuit recently reiterated that "[t]he basic law of this circuit for qualified immunity is set out in *Lassister v. Alabama A & M University*, 28 F.3d 1146 (11th Cir. 1994) (*en banc*)." *Marsh v. Butler County*, 268 F.3d 1014, 1021 n. 1 (11th Cir. 2001) (*en banc*) (citing *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (*en banc*) (holding that "[t]he principles of qualified immunity set out in *Lassiter v. Alabama A & M Univ.*, continue to be the guiding directives for deciding cases involving the question of a state actor's entitlement to qualified immunity in this circuit.") (internal citation omitted)).

*Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)).

Because the doctrine is construed broadly, the "usual rule" is that "only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Redd*, 140 F.3d at 1382 (quoting *Lassiter*, 28 F.3d at 1149). Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (internal quotations omitted); *see also Busby v. City of Orlando*, 931 F.2d 764, 773 (11th Cir. 1991).

The test for determining whether a particular governmental official may be held personally liable for an action allegedly in violation of federal law "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038 (quoting *Harlow*, 457 U.S. at 818, 819, 102 S.Ct. at 2738, 2739) (citation omitted). What this means is that, "[a]s long as the defendant could reasonably have thought his or her action to be consistent with the rights he or she is alleged to have violated, the defendant is entitled to immunity." *Busby*, 931 F.2d at 773. "'For purposes of qualified immunity, an abstract mandate to act 'with care' or 'reasonably' is too vague.' Generalities are just not helpful." *Sanders v. Howze*, 177 F.3d 1245, 1250 (11th Cir. 1999) (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1273 (11th Cir. 1989)).

When analyzing a qualified immunity defense raised by a governmental official in response to § 1983 claims asserted against the official (as here) in an *individual capacity*, courts employ a two-part analysis to determine if a defendant can invoke qualified immunity to bar a plaintiff's claims. The district court must consider, first, whether "the *defendant* government official [has

proven] that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997) (emphasis supplied). Second, if the defendant meets that burden, "the *plaintiff* must then demonstrate that the defendant violated clearly established law based upon objective standards." *Evans*, 117 F.3d at 1320 (emphasis supplied). The Supreme Court has held that for a right to be "clearly established," such that a defendant is not entitled to claim qualified immunity,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful* ..., but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640, 107 S.Ct. at 3036 (internal citations omitted) (emphasis supplied); *see also United States v. Lanier*, 520 U.S. 259, 267, 269, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (holding that, even under the standards necessary to support a criminal conviction of a governmental official, precedents involving "fundamentally similar" facts are not necessary to give reasonable state officials fair warning that their conduct violates constitutional or statutory rights).

It is undisputed that defendants were acting within their discretionary authority as City of Huntsville police officers when they arrested plaintiffs on November 14, 1999. The court thus proceeds directly to the question whether plaintiffs have demonstrated that defendants "violated clearly established constitutional law." *Evans*, 117 F.3d at 1320. This, plaintiffs have failed to do.

While an arrest made without probable cause is a clear violation of the Fourth Amendment, this court's inquiry into the probable cause for plaintiffs' arrest is altered by the fact that defendants contend that they are safeguarded from plaintiffs' suit by qualified immunity. This is because, when qualified immunity is at issue in the context of a Fourth Amendment unreasonable seizure claim,

22

courts look *not* for "probable cause in fact, but *arguable probable cause.*"  *Madiwale*, 117 F.3d at

1324 (quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (omitting citations, internal

ellipses, and internal quotation marks)) (emphasis supplied).

> Significantly, all that is required for qualified immunity to be applicable to an
> arresting officer is "arguable probable cause to believe that a person is committing
> a particular public offense," *Redd v. City of Enterprise*, 140 F.3d 1378, 1384 (11th
> Cir. 1998); "that is, *where 'reasonable officers in the same circumstances and
> possessing the same knowledge as the Defendants could have believed that probable
> cause existed to arrest' the plaintiffs*" *id.* at 1382 (citation omitted).

*Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001) (emphasis added).

Reasonable officers in the same position as Maciorski and Willis could have believed that

there was arguable probable cause to arrest Jeffcoat for DUI during the November 14, 1999 traffic

stop.  Police officers are entitled to conduct a brief investigatory stop of a vehicle if specific facts

create a reasonable suspicion of criminal conduct.  *See United States v. Smith*, 799 F.2d 704, 707

(11th Cir. 1986).  Maciorski had reasonable suspicion to stop Jeffcoat for violating Code of Alabama

§ 32-5a-88(1), which provides:

> Whenever any roadway has been divided into two or more clearly marked lanes for
> traffic the following rules in addition to all others consistent herewith shall apply:
>
> (1) A vehicle shall be driven as nearly as practicable entirely within a single
> lane and *shall not be moved from such lane until the driver has first ascertained that
> such movement can be made with safety.*[105]

Jeffcoat was ticketed for, and later convicted of, this traffic violation.[106]  The record indicates that

Maciorski and Willis both observed Jeffcoat swerve from her lane on at least one occasion, and there

is no dispute as to the fact that Jeffcoat nearly struck Willis's police cruiser in doing so.[107]

---

[105] Code of Alabama § 32-5a-88(1) (1975) (emphasis supplied).

[106] Defendants' Brief in Support at 26.

[107] Second Amended Complaint ¶ 1.

Also contributing to arguable probable cause is the fact that, when Maciorski approached Jeffcoat's car and spoke to her, Maciorski asked Jeffcoat if she had been drinking, and Jeffcoat responded that she had not. According to Maciorski, however, she "smelled the odor of an alcoholic beverage" and walked "back to my vehicle and got my Alcosensor."[108]

> Q.    Now, why did you go back to get your Alcosensor?
>
> A.    Because I smelled the odor of an alcoholic beverage.
>
> Q.    Well, did Ms. Jeffcoat exhibit any signs that she had been drinking?
>
> A.    Well, her driving.
>
> Q.    Other than her driving?
>
> A.    And the odor of an alcoholic beverage.
>
> Q.    But you didn't know where it was coming from?
>
> A.    That's correct.[109]

While plaintiffs contest that Maciorski smelled the odor of alcohol coming *directly from Jeffcoat,* plaintiffs do not appear to dispute that such a smell could have been emanating *from plaintiffs' vehicle itself.*[110] Indeed, Morris admitted that *she* had been drinking earlier that afternoon at the football game, *and that garbage bags inside their vehicle contained empty beer cans consumed by those present at plaintiffs' tailgate party.*[111] *See, e.g., Babers,* 152 F. Supp. 2d at 1305 (finding probable cause for DUI arrest where odor of alcohol was coming from driver's car); *Ingram v. State,* 720 So. 2d 1036, 1040 (Ala. Crim. App. 1998) (finding probable cause for DUI arrest even though

---

[108] *Id.* at 44.

[109] *Id.*

[110] Plaintiffs' Brief in Opposition at 18.

[111] *See* Defendants' evidentiary submissions, Tab 4 (Morris deposition), at 12, 14.

officer was uncertain whether smell of alcohol was coming from driver or inside of driver's car).

Further, although Maciorski initially stopped Jeffcoat because of her erratic driving, Maciorski decided to arrest her only after Jeffcoat refused to comply with on-site sobriety tests.

A.   I said, "If you're not going to take the Alco[sensor test], you need to step from the vehicle and do field sobriety tests."  And she said, "I'm not getting out of the vehicle."

...

Q.   Now, you asked her to step out of the vehicle and what happened next?

A.   She said, "No."  And she held onto the steering wheel at which time I told her that she needed to step out, and she still refused.  So I opened the door.

...

Q.   Now, she refused to take the Alcosensor?

A.   Correct.

Q.   And so your next thing is to do what, arrest her?

A.   No, the field sobriety tests, that's what I asked her to do.

Q.   You told her to get out?

A.   I asked her to step from the vehicle to perform field sobriety tests.

Q.   Now, she wasn't required to do the field sobriety tests, was she?

A.   Not if she didn't want to do them, no.

Q.   As a matter of fact, she could have stayed there in her car until the determination was made that she was under arrest, correct?

A.   I think that's what happened.

Q.   She didn't even have to talk to you if she didn't want to, did she?

A.   No.

Q.      So when you told her to get out of the car, she said, "No"?

A.      That's correct.

Q.      And instead of saying, "You're under arrest" at that time, you tried to get her out, correct?

A.      No. I opened the door and I said to her, "You need to step out, I'm placing you under arrest."

...

Q.      Now, you heard her say that, no, she was not going to take the field sobriety tests, so at that moment you had formed the opinion that she was under arrest and you were going to take her to jail?

A.      That's correct.

Q.      And what was that based on?

A.      *That's based upon her driving, the smell of an alcoholic beverage, her demeanor, and the fact, I mean, just because she says she is not getting out of the vehicle doesn't mean that she could drive off on the street.*[112]

"Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Myles*, 245 F.3d at 1302-03. The inquiry, then, is *not* whether Jeffcoat was actually guilty of DUI, but whether Maciorski, an experienced DUI Task Force officer, had sufficient objective evidence to arrest Jeffcoat for driving under the influence of alcohol. *See id.* at 1303.

In analyzing a qualified immunity defense, district courts are to consider only the "clearly established law and the information possessed by the official at the time the conduct occurred." *Hope v. Pelzer*, 240 F.3d 975, 981 (11th Cir. 2001) (citation and internal quotation marks omitted).

---

[112] *Id.* at 48, 49, 50-51, 55 (emphasis supplied).

"For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150. Further, when attempting to demonstrate that the federally protected rights that a governmental official allegedly violated were "clearly established," a plaintiff

> must establish more than broad legal truisms; he or she must demonstrate that the law fixed the contours of the right so clearly that a reasonable official would have understood his acts were unlawful. ... Thus, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994) (*en banc*). Moreover officials need not "'be creative or imaginative in drawing analogies from previously decided cases.'" *Id.* at 1150. (citations omitted).

*Dolihite v. Maughon*, 74 F.3d 1027, 1040-41 (11th Cir.), *cert. denied*, 519 U.S. 870, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996).

Plaintiffs have pointed to no "clearly established law" on or prior to November 14, 1999 that would have made either defendant aware that their actions in arresting Jeffcoat for DUI violated Jeffcoat's Fourth Amendment rights.[113] Because defendants had *arguable* probable cause to arrest Jeffcoat for DUI under the circumstances presented here, defendants are entitled to qualified immunity from plaintiff's first Fourth Amendment claim.

## B.   Plaintiffs' Second Fourth Amendment Claim:  No Probable Cause To Arrest Either Plaintiff for Resisting Arrest

The court next considers whether plaintiffs have stated a claim that they were deprived of constitutional rights when defendants arrested both of them for resisting arrest. Continuing with the

---

[113] *See* Plaintiffs' Brief in Opposition at 17-19.

narrative of events during the November 14, 1999 traffic stop, once Jeffcoat refused to submit to Maciorski's request that she undergo field sobriety testing, "the next thing that happened is that [Maciorski] opened my car door."[114] Maciorski tried to "get [Jeffcoat] out of the car," while Jeffcoat protested, saying "'No, stop, please don't, what are you doing?,'" and was "kind of frantic about her trying to remove me from my car."[115] Jeffcoat admitted that she resisted leaving her car.[116] At that point, Maciorski began to pull with both hands on Jeffcoat's left arm. (Both of Jeffcoat's hands were gripping the steering wheel.)[117] Jeffcoat began to plead with Maciorski, saying "'Please stop, we just need to go home, there is no reason for this to be happening.'"[118] Jeffcoat also asked her sister to call Harald Bailey, a real estate attorney, for assistance.[119]

Jeffcoat contends that Maciorski did not tell her that she was under arrest prior to attempting to remove her from the automobile,[120] but rather that it was Willis who said that she was under arrest. Jeffcoat claims that, once she heard Willis state that she was under arrest, she responded, "'Okay, I'm getting out of the vehicle.' And I was going to get out at that point."[121] Even so, Jeffcoat admits that she refused to permit defendants to handcuff her without a struggle.

Jeffcoat testified in deposition that, once she stepped out of the automobile, Willis instructed her to put both hands on the side of her car.[122] Jeffcoat complied, placing both hands on the driver's

---

[114] Defendants' evidentiary submissions, Tab 3 (Jeffcoat deposition), at 34.

[115] *Id.* at 34.

[116] *Id.* at 38.

[117] *Id.* at 36.

[118] *Id.* at 38.

[119] *See id.*

[120] *See id.* at 40.

[121] *Id.* at 42.

[122] *See id.* at 44.

28

side back door.[123] Although unsure whether it was Willis who handcuffed her, Jeffcoat was sure that

a male officer who placed a handcuff on her right wrist.[124]  Jeffcoat "panicked."[125]

Q.    And when you say you panicked, how did you exhibit or manifest that?

A.    I think I was screaming, "No, please don't, I'm very claustrophobic, please don't put the handcuffs on me, please don't do this."

      I was trying to ask them to settle down, calm down, "Please don't do this."

Q.    You were asking them to settle down; were they doing anything that would indicate to you that they were out of control in any way?

A.    That indicated to me that they were out of control plus all these events happening so quickly, I was just stunned also by the progression of things ... and that's what made me feel that they were out of control and they were not stepping back and doing anything, they just made up their minds to arrest me.

      I mean, this is what was going on in my mind. ...

Q.    You felt they were out of control because they didn't do what you told them to, basically?

...

A.    I felt that the situation was out of control, that they were in charge of it and not that they were not doing what I wanted them to, but that they were not doing what was right.

Q.    Were they physically abusing you in any way, did either of them hit you?

A.    They were struggling with me and pulling on me and throwing me around, the two of them together.

Q.    *And you were at the time, though, resisting their putting the handcuff on your other wrist; is that correct?*

A.    *I was resisting them putting the handcuff on me, on my other wrist.*

---

[123] *See id.*

[124] *See id.* at 44-45.

[125] *Id.* at 45.

Q.   *And how were you resisting, what were you doing?*

A.   *I was struggling not to put my hand behind me.*

...

*I was — I think that I was holding onto a belt loop ... to my jeans.*

Q.   Were you moving your arm when they were attempting to put the handcuff on your wrist?

A.   No, I don't remember really clearly specific movements. ...

Q.   Were you turning your body, jerking around?

A.   I may have. ... I was very terrified and I was screaming, I was screaming for Susan to help, I may have screamed for her to call Harald [Bailey, a real estate attorney], "Get help."

I remember at one point I said, "Please stop, I'll take any tests you want me to take, please don't put the handcuff on me." ...

Q.   But you were already under arrest at that point?

A.   Yeah, I guess that I was.

Q.   And did the officers continue to attempt to put the handcuff on your left wrist?

A.   Yes, sir, they did.

Q.   And did you continue to struggle and resist their attempts to do so?

A.   Until I felt that my arm would be broken and I had to let go.[126]

Morris's deposition testimony corroborates Jeffcoat's account of these events.

Q.   What did you observe as far as what your sister was doing?

A.   My sister was crying and begging, "Please don't handcuff me."

---

[126] *Id.* at 46-49 (emphasis supplied).

Q.   *Was she twisting and turning at the time?*

A.   *Yes, she was.*

Q.   *And was she trying to keep them from putting the handcuffs on her left wrist?*

A.   *Yes, she was.*

Q.   *How was she trying to do that?*

A.   *She was keeping her arm away from them and turning her body.*

Q.   And how close were you to where this all was going on?

A.   I was about 3 feet away I would say.

...

Q.   *And you knew she had been told that she was under arrest?*

A.   *Yes, sir.*

Q.   *And you saw her struggling and twisting and turning and resisting the officers' attempts to handcuff her?*

A.   *Yes, sir.*[127]

Code of Alabama § 13A-10-41 states that "[a] person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting [sic] a lawful arrest of himself or of another person."  While plaintiffs dispute the necessity of defendants' use of handcuffs to effect Jeffcoat's arrest, they acknowledge that the City of Huntsville Police Department "has a policy that handcuffs will be used for all arrestees."[128]  Further, Alabama law is clear that law enforcement "officers may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo' so that the limited purposes of the stop may be achieved."

---

[127] *Id.*, Tab 4 (Morris deposition), at 37-38 (emphasis supplied).

[128] *See* Plaintiffs' Brief in Opposition at 21.

31

*Walker v. City of Mobile*, 508 So. 2d 1209, 1212 (Ala. Crim. App. 1987) (quoting *United States v. Jones,* 759 F.2d 633, 636-37 (8th Cir. 1985) (quoting, in turn, *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985)). It therefore seems neither unreasonable nor surprising that defendants should have used handcuffs to take Jeffcoat into custody, in compliance with departmental policy and in furtherance of their personal safety — especially as Jeffcoat had already exhibited a willingness to struggle physically with Maciorski in her refusal to exit her automobile.

The undisputed evidence — specifically both plaintiffs' detailed admissions of Jeffcoat's struggle — firmly establishes that Jeffcoat resisted her arrest for DUI. Alabama courts applying the relevant statute have held that defendants who struggle with an arresting officer will be guilty of resisting arrest. *See, e.g., Carroll v. State*, 701 So. 2d 47, 50 (Ala. Crim. App. 1996) (holding that arrestee's struggling and fighting with officer was grounds for arrest); *Walker,* 508 So. 2d at 1214 (same). As such, plaintiffs have failed to allege that they were deprived of a constitutional right when Jeffcoat was arrested for resisting arrest.

Morris similarly claims that she was deprived of her constitutional rights under the Fourth Amendment, because she was arrested without probable cause for resisting arrest. Morris explains her conduct during the traffic stop as follows:

A.   [T]wo of the officers were with Barbara [Jeffcoat], and then one came over to me to tell me to get back into the vehicle.

Q.   You had exited the vehicle at this point?

A.   Yes.

Q.   You got out at what point?

A.    At the point that my sister was screaming, "Help me, help me," and to call Harald, to get someone to help us.

And so I got out of the car and started trying to reason with the officer who was there with me. And I can't remember if it was Officer Willis or the other man. But I was telling them, you know, "She's an incest survivor, she's highly claustrophobic, *you will not be able to get both handcuffs on her,* you know, *without a fight,* if there is another way to do this." I was pleading with them, just pleading.

Q.    And this conversation was taking place where?

A.    On the — well, on the passenger side of the Jeep, and *then as I was moving around to the back of the Jeep.*

Q.    And, of course, you were moving around the back of the Jeep towards where Ms. Jeffcoat and Officer Maciorski were and the other male were?

A.    Towards where I could open the Jeep and get a cellphone out.

...

Q.    *Were you ever told to stay inside your Jeep?*

A.    *Yes, sir.*

Q.    Who told you that?

A.    I know Officer Willis told me once.

Q.    When was that?

A.    When he was on my side and we were chatting before it had elevated to the point that they were trying to pull Barbara out of the car when I was just telling him, you know, "We're tired, there has just been a big misunderstanding."

Q.    And he told you to stay inside the vehicle?

A.    Yes, to stay inside the vehicle. And at that point I did.

Q.    *And you were told some other time to stay inside the vehicle as well?*

A.     *To get back in, to get in the car.*

Q.     At you were told that at what point?

A.     After I got out.

Q.     Before you went around to the back to open up the hatch?

...

A.     Around that period of time.

...

Q.     And at that point your sister was being placed under arrest by Officer Maciorski and whatever male officer was over there?

A.     Yes, sir.

...

Q.     *And you did not get back in the vehicle?*

A.     *No, sir.*

Q.     You went over where your sister and the two officers were; is that correct?

A.     As I recall, I was around at the back of the Jeep and in the back area of the Jeep.  And the other two officers and my sister were more or less struggling and sort of moving without plans.  So they sort of came towards me.[129]

Thus, although Morris had been told at least twice to stay in, or to get back into, her vehicle, she admits that she ignored the commands, and instead remained about three feet from the arresting officers and Jeffcoat.[130]

Q.     And were you told to get back away?

A.     Yes, sir.

---

[129] Defendants' evidentiary submission, Tab 4 (Morris deposition), at 33-37 (emphasis supplied).
[130] *See id.* at 38, 39.

34

Q.      And did you back off for a while and then come back?

A.      No. I backed off.

Q.      And did you stay away after you were told to get away?

A.      Yes, sir.[131]

In fact, however, the videotape of the traffic stop clearly shows Morris approaching the police officers struggling with Jeffcoat on at least six occasions.[132] Defendants appeared to push Morris away from the scene of their struggle on at least three occasions,[133] and can be heard telling Morris to "stand back," and to "get away from me," on at least two occasions.[134] Morris admits that Maciorski told her on a number of occasions to "shut up and get back."[135] According to Maciorski, Morris presented a threat to her, because Morris approached on Maciorski's right-side, the side on which her firearm was holstered.[136] As a result, once Jeffcoat was in handcuffs, Willis arrested Morris for resisting Jeffcoat's arrest.

It bears reiterating that Code of Alabama § 13A-10-41 states that "[a] person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting [sic] a lawful arrest of himself *or of another person*."[137] Morris's own testimony evidences that she disobeyed police orders on two occasions to stay in her vehicle, and on six occasions to stay away from the arresting officers, in furtherance of convincing the police officers not to arrest or handcuff Jeffcoat. "The obstruction of police officers in the performance of their official duties is

---

[131] *Id.* at 39-40.

[132] *See supra* note 35.

[133] Plaintiffs' evidentiary submission, Tab 7 (videotape), at 1:30:22, 1:30:28, and 1:30:32.

[134] *Id.* at 1:31:18.

[135] Defendants' evidentiary submission, Tab 4 (Morris deposition), at 42-43.

[136] *Id.*, Tab 1 (Maciorski deposition), at 70.

[137] Code of Alabama, § 13A-10-41 (1975) (emphasis supplied).

an offense at common law and has been made so by statute in most, if not all, of the States of the Union." *Speck v. State*, 41 So. 2d 198, 199 (Ala. Ct. App. 1949); *see also Shuttlesworth v. City of Birmingham*, 149 So. 2d 921, 923 (Ala. Ct. App. 1962) (holding that defendant who blocked officer's path while officer was taking others into custody constituted interference with police officer's discharge of his legal duty). The evidence submitted to the court demonstrates that defendants had probable cause to arrest Morris when she disobeyed their orders and interfered with the smooth administration of their arrest of Jeffcoat. Morris thus has not stated a cognizable claim that she was deprived of her constitutional rights under the Fourth Amendment when she was arrested for resisting arrest during the November 14, 1999 traffic stop.

**C.     Plaintiffs' Fourth Amendment Excessive Force Claim**

Plaintiffs allege that they were subjected to "excessive force with the intent to inflict unnecessary harm upon the plaintiffs and such use of force caused physical and mental injuries to the plaintiffs."[138] The Fourth Amendment to the United States Constitution provides, in part, that: "The right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated...." A citizen thus has the right to be free from unreasonable force while being arrested or detained by a law enforcement officer. *See, e.g., Street v. Parham*, 929 F.2d 537, 540 (10th Cir. 1991); *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989). The application of force by police officers exceeding that which is reasonable and necessary under the circumstances exposes the individual officer to a claim for damages under § 1983. *See, e.g., Davidson v. O'Lone*, 752 F.2d 817, 827 (3d Cir. 1984); *see also, e.g., Lester v. City of Chicago*, 830 F.2d 706, 712 (7th Cir. 1987) (a pre-*Graham* case holding that a police officer's use of force violates the Constitution if, judging

---

[138] Complaint ¶ 49.

36

from the totality of the circumstances, the officer used greater force than was reasonably necessary). The reasonableness of the force applied is measured as of the precise moment at which force is used; events that occurred before that moment, though perhaps giving factual context to the use of force, are not probative of the reasonableness of the decision to use force. *See Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991).

To establish a Fourth Amendment violation based on excessive or unreasonable force, plaintiffs must demonstrate the following: (1) in using force, defendants "seized" plaintiffs, within the meaning of the Fourth Amendment; and (2) that the force applied by defendants was objectively unreasonable. *See Graham v. Connor*, 490 U.S. 386, 395-96, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989). That plaintiffs were seized when they were arrested on November 14, 1999 is not in dispute. The court proceeds, then, to determine whether the force defendants used in effectuating those arrests was objectively unreasonable.

In *Graham*, the Supreme Court emphasized that the test for objective unreasonableness is fact-intensive, and that courts should examine "the severity of the crime at issue, whether [plaintiff] poses an immediate threat to the safety of others, and whether [plaintiff] is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. at 1872. A showing of bad faith on the part of the defendant is not required, and the facts are considered "without regard to [defendant's] underlying intent or motivation."[139] *See id.* at 397, 109 S.Ct. at 1872.

Plaintiffs argue that Jeffcoat was subjected to excessive force because: Maciorski tried to physically pull Jeffcoat from her vehicle prior to her arrest; because Jeffcoat was placed in

---

[139] Thus, plaintiffs' repeated allegation that Maciorski was angry and frustrated with Jeffcoat during the arrest is of no moment. *See, e.g.* Plaintiffs' Brief in Opposition at 24.

handcuffs; and Jeffcoat was exposed to "claustrophobic conditions" for approximately two hours once she was arrested.  Jeffcoat offers as proof of this alleged excessive force the injuries she sustained to her wrist, and the mental and emotional distress she suffered.[140]  Morris claims that she was "physically and forcefully shoved" on more than one occasion by Maciorski during Jeffcoat's arrest, and thus was subjected to excessive force in violation of the Fourth Amendment.[141]  Morris admits that she sustained no physical injuries, but contends that she suffered sleeplessness as a result of the incident, for which she was prescribed an anti-depressant.[142]

The Supreme Court has made it clear that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  Addressing Jeffcoat's claims first, the court notes that Jeffcoat admits that she refused to exit her vehicle, even after she was instructed to do so by Maciorski.  In *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Supreme Court examined a driver's refusal to exit a vehicle during a lawful traffic stop for the driver's improper lane change.  The Court explained that the Fourth Amendment permits an officer to summon an occupant from his vehicle during a traffic stop, even if the officers have no reason to suspect that the occupants may engage in further criminal behavior.

> Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car.  We think this additional intrusion can only be described as *de minimis*.  The driver is being asked to expose to view very little more of his person than is already exposed.  *The police have*

---

[140] *Id.* at 26.

[141] *Id.* at 26-27.

[142] Defendants' evidentiary submission, Tab 4 (Morris deposition), at 66-67.

> already lawfully decided that the driver shall be briefly detained; the only question
> is whether he shall spend that period sitting in the driver's seat of his car or standing
> alongside it. Not only is the insistence of the police on the latter choice not a
> "serious intrusion upon the sanctity of the person," but it hardly rises to the level of
> a "'petty indignity.'" Terry v. Ohio, supra, 392 U.S. at 17, 88 S.Ct. at 1877. What
> is at most a mere inconvenience cannot prevail when balanced against legitimate
> concerns for the officer's safety.

Id. at 111, 98 S.Ct. at 333 (emphasis supplied). The Alabama courts have adopted this reasoning,

explaining that "'[o]nce a routine traffic stop is made, the officer may either keep the driver of the

vehicle in the car or exercise his discretion to require the driver to exit the vehicle, even though the

officer may lack a particularized reason for believing that the driver possesses a weapon.'" Carroll,

701 So. 2d at 49-50 (quoting Smith v. State, 606 So. 2d 174, 176-77 (Ala. Crim. App. 1992)

(quoting, in turn, New York v. Class, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986)).

Carroll recognized that an "appellant's arrest for disorderly conduct was proper because the

appellant had failed to obey the officer's instructions to get out of the vehicle, and thus required the

officer to forcibly remove him from the vehicle ...." Carroll, 701 So. 2d at 50 (citing Ex parte

Thomas, 666 So. 2d 855, 857 (Ala. 1995)). Maciorski similarly had the authority to demand that

Jeffcoat exit her car, and when Jeffcoat refused, to extricate her with force from the vehicle. When

Jeffcoat refused Maciorski's command to exit her vehicle, steadfastly holding instead to the steering

wheel, Maciorski grasped Jeffcoat's left arm with both hands, and proceeded to pull her from the

vehicle.[143] Although Jeffcoat contends this treatment contributed to a long-term wrist injury and

mental and emotional distress,[144] this court finds that the "actual force used and the injury inflicted

were both minor in nature." Nolin v. Isbell, 207 F.3d 1253, 1256 (11th Cir. 2000). The Eleventh

---

[143] Id., Tab 1 (Maciorski deposition), at 56, 57, 59.

[144] Plaintiffs' Brief in Opposition at 26.

Circuit has "established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Id.* at 1257.

In addition, as discussed above, the fact that defendants placed Jeffcoat in handcuffs was a reasonable measure taken in furtherance of effecting her arrest.[145] The court is mindful that Jeffcoat was "actively resisting arrest." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. The simple fact that Jeffcoat was held for approximately two hours in Maciorski's police cruiser does not compel a finding that she was subjected to excessive force. Finally, plaintiffs have not directed this court to any authority demonstrating that defendants' conduct was objectively unreasonable. *See id.* at 395-96, 109 S.Ct. at 1871-72; *see also Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997).

The court makes the same finding as to Morris's sole excessive force claim: that she was shoved by Maciorski during defendants' struggle with Jeffcoat.[146] There is uncontradicted evidence in the record demonstrating that Morris posed a potential danger to defendants — she repeatedly defied their commands, approached Maciorski on her firearm-side, and attempted to open the boot of the Jeep Cherokee — all of which justified defendants' use of force against her. *See Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998). As in Jeffcoat's case, Morris was "pos[ing] an immediate threat to the safety of others, and ... actively resisting arrest or attempting to evade arrest ...." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.

This court finds therefore that plaintiffs have failed to state a cognizable claim that their constitutional rights under the Fourth Amendment were violated by use of excessive force during the November 14, 1999 arrest.

---

[145] *See supra* text accompanying notes 135.

[146] Plaintiffs' Brief in Opposition at 26.

40

**D.     Plaintiffs' Supplemental State Law Claims**

This leaves for discussion only plaintiffs' various state law tort claims, including false arrest,

false imprisonment, assault and battery, and malicious prosecution.[147]  In cases in which the court's

removal jurisdiction was based solely upon a federal question, as here, the district court has

discretion to entertain state claims that are pendant (or supplemental) to the federal claim.  *See* 28

U.S.C.  § 1367(a).  The district court may decline to exercise supplemental jurisdiction when:

> (1)     the claim raises a novel or complex issue of State law,
>
> (2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)     the district court has dismissed all claims over which it has original jurisdiction, *or*
>
> (4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied).  The Supreme Court has explained the role of the district

court, instructing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant state-law claims.  *When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.*

*Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 349-50, 108 S.Ct. 614, 618, 98 L.Ed.2d 720

(1988) (emphasis supplied) (citing *Mine Workers v. Gibbs,* 383 U.S. 715, 726-27, 86 S.Ct. 1130,

1139, 16 L.Ed.2d 218 (1966)).

---

[147] *See* Complaint, at Counts I-XII.

41

"[I]n the usual case *in which all federal-law claims are eliminated before trial*, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will *point toward declining to exercise jurisdiction over the remaining state-law claims.*" *Carnegie-Mellon*, 484 U.S. at 350 n.7, 108 S.Ct. at 619 n.7 (emphasis supplied); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims"). Plaintiffs' state law claims here raise complex and novel issues of state law,[148] "something the courts of Alabama are in the best position to undertake and, for reasons of federalism, should undertake in this sensitive area." *Nolin*, 207 F.3d at 1258.[149] Therefore, the balance of factors weigh in favor of declining supplemental jurisdiction, and this court exercises its discretion to dismiss plaintiffs' state claims without prejudice.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is due to be granted in part, specifically as to plaintiffs' Fourth Amendment claims, and denied in part, as to plaintiffs' state law claims.    An order consistent with this memorandum opinion shall be issued

---

[148] Plaintiffs conceded in their brief in support of their motion for injunctive relief that "[t]he Alabama courts have not decided the specific issue of whether medical staff bylaws constitute a binding contract." (Plaintiffs' brief at 23.)

[149] When discussing the retention of jurisdiction over supplemental state law claims after all federal questions had been resolved, the Eleventh Circuit in *Nolin* said:

> At this time, the case retains no independent basis for federal jurisdiction and the only claims that remain deal with complex questions of discretionary function immunity in the state of Alabama. A proper resolution of the two state law causes of action will require a careful analysis of Alabama law — something the courts of Alabama are in the best position to undertake and, for reasons of federalism, should undertake in this sensitive area. *We conclude that the district court should dismiss the state law claims so that Appellee may pursue them in state court.*

*Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (emphasis supplied).

contemporaneously herewith.

DONE this _9th_ day of January, 2002.

_____
United States District Judge

43